**E-FILED**
Tuesday, 13 December, 2016  08:46:10 AM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

PAUL ECKERMANN,
    Plaintiff,

v.                         Case No. 4:15-cv-04170-SLD-JEH

CAROLYN COLVIN, Acting
Commissioner of Social Security,
    Defendant.

## Report and Recommendation

Now before the Court is the Plaintiff's, Paul Eckermann, Motion for Summary Judgment (Doc. 10) and the Commissioner's Motion for Summary Affirmance (Doc. 14). This matter has been referred for a Report and Recommendation.  The Motions are fully briefed (Doc. 10-1, 15, 16), and for the reasons stated herein, the Court recommends that the Plaintiff's Motion for Summary Judgment be granted and Commissioner's Motion for Summary Affirmance be denied.

## I

On July 1, 2010, the Claimant, Paul Eckermann, filed a child insurance benefits claim through his parents. A supplemental security income claim was filed on September 8, 2010. Mr. Eckermann alleged a disability onset date of April 1, 2004 (AR 153), claiming he was disabled due to schizophrenia/schizoaffective disorder, depression, cognitive difficulties, and generalized anxiety disorder.

An administrative hearing was held before the Honorable Judge Diane Raese Flebbe. (AR 37). Following the hearing, Eckermann's claim was denied.

(AR 15). Eckermann's request for review by the Appeals Council was also denied. (AR 1).

On January 3, 2013, Eckermann filed his first case in this Court, case no. 4:13-cv-04002-SLD-JAG. The Court granted summary judgment in favor of Eckermann and the case was remanded. (AR 811). Upon remand, the ALJ was to further consider the opinions of the treating sources and evaluate Listing 12.06(C). The Appeals Council vacated the ALJ's Decision and remanded for further proceedings consistent with the Court's Order.

A second hearing before the ALJ was held on February 2, 2015. (AR 684). The ALJ denied the claim. Eckermann filed written exceptions with the Appeals Council on April 3, 2015, but the Appeals Council did not assume jurisdiction. The ALJ's Decision from February 27, 2015, is the final decision of the Commissioner. Eckermann filed the instant civil action seeking review of the ALJ's decision on November 18, 2015.

## II

At the time he applied for benefits, Eckermann was a 23-year-old man living in Moline, Illinois. He graduated college *cum laude* in less than four years, and has previously worked as a grocery store clerk, item manager intern, library page, bank teller, and movie theater usher. (AR 216). On his application, he indicated that he worked 10 hours a week at a tennis club. On his Form SSA-3368, completed by his mother in 2010, he provided that he took medication for anxiety and schizophrenia, receiving therapy and psychotherapy for his conditions. (AR 218-19). On his function report, which Eckermann's mother completed for him, he reported that his mental health disability causes high levels of anxiety and confusion, preventing him from performing job duties. (AR 233). Further, he claimed that he cannot perform multiple tasks at once. He also claimed that he is nervous around individuals who are not immediate family

2

members. Because of his conditions, he cannot concentrate on his job, listen to instructions, or otherwise perform responsibilities.

Eckermann's daily routine consists of waking up mid-morning, watching the TV, taking a walk, reading magazines, napping, and browsing the web on his computer. He reports that he has problems sleeping due to his anxiety, and he needs more sleep than average. (AR 234). He experiences side effects from his medications, including shaky hands, drowsiness, and listlessness. (AR 240). His parents remind him to take his medicine and prepare his meals. (AR 235).

According to Eckermann, he is able to do household chores such as vacuuming, dusting, and some mowing when encouraged by his parents, for a duration of about 30 minutes once a week. (AR 235). When he does help mow the lawn, however, he can only mow part of the yard because he is afraid to mow certain parts of it. (AR 298). He shops once a week for musical equipment supplies. (AR 236). He is unable to handle money, as he reports he agonizes over the purchases he makes and tries to return the regretted purchases. (AR 237). His other hobbies include shopping, playing tennis, and playing guitar, but he reported that because of his condition, he cannot concentrate or complete any of these activities as much as he used to.

He is able to spend time on Facebook and has about one social outing per week. (AR 237). He also attends church, and goes to restaurants and friends' houses. Eckermann reported that he sometimes gets mad or frustrated with others and reports that due to his illness, "[I] probably socialize somewhat less." (AR 238). He also has issues with his memory. Although he stated that he handles stress and changes in routine very poorly, he gets along with authority figures fairly well. In addition to feeling anxious and nervous, he will obsess on something that frustrated him and he lacks confidence for even simple tasks. (AR 239).

In a function report submitted about a month later, and completed by his mother, Eckermann further reported paranoia (AR 263), needing reminders for bathing and shaving (AR 264), and only being able to drive short distances (AR 266). He described his shopping as erratic. He reported that he only interacts with others twice a month (AR 267) and shops once or twice a month (AR 266). Although on the previous report he stated that he attends weekly church, he wrote that he attends a couple times a month when his parents ask. (AR 267). He claimed his schizophrenia was affecting his ability to talk, hear, see, and get along with others, including his father. (AR 268). In the past, he was paranoid that his father was out to get him. (AR 275). There were also additional medications listed. (AR 270). Once in each 2004 and 2005, his parents had to call the police to get him under control; Eckermann once spent two days in the Robert Young Center, a mental health center. He gets nervous when he drives and easily gets lost. (AR 273). He has issues finding friends to hang out with, noting that his friend with autism understand him the best. (AR 273-74). Sometimes, he speaks with his sister on the phone, but picks fights. (AR 274). When his parents are gone, he becomes fearful and has to have a to-do list because he forgets spoken instructions. (AR 274). He reported than in March 2006, he had a psychotic attack, where he damaged ten cars and was charged with a felony; the charges were dropped due to his mental illness. (AR 275).

At the hearing before the ALJ on February 2, 2015, three years after the original hearing in 2012, Eckermann gave testimony along with Nathan Strahl, a psychological expert, Dr. Colin Andrew Lodico, a witness, and George Paprocki, a vocational expert (VE). The ALJ first questioned Eckermann, asking about his weekly counseling in college and his accommodated testing conditions. (AR 690). Eckermann testified that he took exams in isolated rooms and received extended time due to his trouble concentrating.

4

Eckermann also testified that he tried working part time at his local tennis club but he quit due to the stress of dealing with the public for a long period of time. (AR 692). He also tried working at a technology company but was let go because his employers were not understanding, and were not accommodating of his slower pace. (AR 693).

Eckermann testified that he sees Dr. Lodico at least once a month, maybe more. (AR 696-97). Dr. Lodico treated him for the past ten years. Eckermann also testified that he sees Dr. Nissen, a psychiatrist, once every few months. He testified that he has been hospitalized once, a few months before the hearing. (AR 698). Eckermann had become agitated with his parents, even though he was taking his medications. (AR 698). After speaking to a psychologist, he was given the option to stay or return home, and Eckermann chose to go home. (AR 699).

Eckermann testified that it is difficult to predict his symptoms or whether he will have a good day or bad day. (AR 700). Despite his medication, he stated that he has many mood swings and is unable to focus at a job. He also experiences racing thoughts. (AR 701). On bad days he lacks motivation and experiences side effects from his medication, particularly dizziness. *Id*.   He testified that he has about three bad days a week. *Id*. At the 2012 hearing, Eckermann testified that he would meet friends and walk around the mall to get out of the house; however, now he mostly goes by himself, because his friends have jobs. (AR 703). He walks around the mall by himself every other day to avoid sitting at home all day. Occasionally, he will go see a movie or play guitar with a friend, and has watched football with friends a couple times. (AR 703-04).

Eckermann continues to play first chair violin in the Black Hawk Community Orchestra, practicing once a week, and performing concerts once a semester. (AR 705). When he attends weekly church, he will play guitar during

service, although Eckermann testified that he is not very accomplished, and uses the music as an outlet.

Next, Dr. Nathan Strahl, M.D., a psychiatrist and independent medical expert, testified by phone. Dr. Strahl testified that Eckermann's impairments have most recently manifested as residual symptoms. For instance, the symptoms are well controlled by medication except at night. Dr. Strahl testified that anxiety can exacerbate schizophrenia, and schizophrenia can also exacerbate anxiety. (AR 711). The doctor reported that Eckermann was compliant to treatment, has no substance abuse issues, and his condition is consistent and stable. (AR 715-16). Dr. Strahl also testified to the following: "It's not the stability issue that's the factor it's his ability to handle stress in mixed company when people are around him as referenced within the medical record." (AR 716). He added that Eckermann's "ability to handle stress when he's around other people who may be looking at him" causes his paranoia. (AR 717).

According to Dr. Strahl, Eckermann does not meet the listing 12.03B, the listing for schizophrenic, paranoid, and other psychotic disorders. (AR 710-11). Under 12.03C category, Dr. Strahl similarly found that Eckermann did not meet the criteria, although he stated that the Claimant's issues with stress are reflected in the medical record. (AR 716).  Instead, he found that Eckermann's activities of daily living, socialization, focus, concentration, and episodes of decompensation were not in the extreme range. (AR 712-13).  Specifically, Dr. Strahl testified that Eckermann is capable of taking care of his personal hygiene, can drive, and "can get out and do things." (AR 713).

Dr. Strahl believed that Eckermann's ability to follow detailed instructions would be moderately or markedly limited, and his ability to carry out complex instructions would be markedly or extremely limited. (AR 718). In fact, Dr. Strahl made it clear that detailed or complex instructions "in any realm, shape, or form"

would not be within Eckermann's ability to follow. (AR 719). Dr. Strahl agreed with Eckermann's doctor in limiting him to minimal social interactions. (AR 719).

Dr. Strahl testified that Eckermann would be moderately limited with regard to simple, routine, repetitive tasks in a non-threatening environment; however, the social interaction is inseparable and any position where he would have to socially interact would take his limitation to the marked or extreme level. (AR 710-21). Working with others will increase stress and worsen the schizophrenia; consequently, Eckermann would no longer be able to continue working. (AR 733). He also testified that Eckermann is moderately limited in his ability to sustain an ordinary routine without special supervision. (AR 721).

Dr. Strahl also explained that Eckermann is in a residual phase of his illness, meaning his symptoms are more consistent. (AR 276). Further, Dr. Strahl found that some of Eckermann's ability to socialize in his activities of daily living – such as playing in a band – demonstrated that he was not markedly or extremely limited, as the medical record reflects. (AR 727).

When asked about Eckermann's good days and bad days, Dr. Strahl testified that:

> I don't know that, that necessarily is something that is preventative for us to go forward with our lives. And most people have to deal with good days and bad days because that is part of life. I don't see that necessarily as a deterrent that is unique to him as it is to other people who can function with such considerations.

(AR 730). Dr. Strahl clarified that Eckermann can interact with supervisors and occasionally make contact with co-employees and the public. (AR 734). However, there should be about five people or less within proximity of Eckermann while he is working. (AR 735).

Dr. Strahl testified that Eckermann's capability of performing simple, routine, repetitive tasks overcame his difficulties with stress, and he was

therefore below the criteria of 12.06B. (AR 736). Dr. Strahl stated that he based his opinion on the evidence of the medical record and the activities in which Eckermann participates. (AR 744). Regarding the treating physician's need for constant reassurance, Dr. Strahl hesitated to answer but testified that in the record and from the level of functionality, he did not see that as necessary. (AR 746).

Next, Dr. Colin Andrew Lodico, Eckermann's treating physician of 10 years with a Ph.D. in clinical psychology, testified. Dr. Lodico disagreed with Dr. Strahl's testimony that Eckermann's anxiety was tied to his social interactions. (AR 748). Dr. Lodico believes that his anxiety is related to his schizophrenia, stemming from his struggles to control his thinking. (AR 748). Dr. Lodico testified that Eckermann becomes irrational and this occurs even when Eckermann lives at home, in a stable environment. (AR 749). He noted that there were episodes where Eckermann became argumentative, irrational, and unable to reason with. (AR 749). Dr. Lodico testified that Eckermann currently "has a stress-free life and yet he continues to have episodes of both anxiety and symptoms of schizophrenia on a regular basis." (AR 749). Dr. Lodico gave an example of when Eckermann worked as a courier for the bank where he was not around other people. At that job, Eckermann experienced rumination and racing thoughts, which compromised his ability to perform at the job. (AR 750). Dr. Lodico even testified that he tried to encourage him to maintain employment, but due to these symptoms, Dr. Lodico testified that no one could have a logical conversation with Eckermann. (AR 750).

Regarding Eckermann's social activities, Dr. Lodico testified that Eckermann has almost quit the orchestra on several occasions. Dr. Lodico noted that the Claimant's family has a personal relationship with the person who runs the orchestra, many people have encouraged him to remain in the orchestra, and

the orchestra is not very advanced. (AR 752). Additionally, Dr. Lodico noted that the Claimant has been playing violin from a very early age, which is why playing the violin is not stressful for him, mostly due to his skill and ability to play the pieces with little effort, because his playing in the orchestra is below his ability. *Id.* Dr. Lodico added that the practices and concerts are rare and are not reflective of his ability to work eight hours a day. When the ALJ asked how the time factor fit into Dr. Lodico's analysis, Dr. Lodico testified that the time commitment here was very low, and even though Eckermann has minimal social interaction in very isolated activities. (AR 755). Dr. Lodico also testified that Eckermann is irrational and is not someone who can be reasoned with on a regular basis, due to his ruminating. (AR 757). Dr. Lodico testified that he believes Eckermann's Global Assessment of Functioning (GAF) is 35, which has declined since college. (AR 757). This is shown in his irrationality and loss of touch with reality. (AR 758). Dr. Lodico spent time explaining to the ALJ that Eckermann loses control of his thoughts, which is a symptom of schizophrenia. Also, the doctor explained that schizophrenia is not consistent; a schizophrenic individual could be rational in the morning but incoherent and irrational at night. (AR 759).

When questioned by the Claimant's attorney, Dr. Lodico testified that Eckermann demonstrates symptoms on a regular basis and has had emergency contact with Eckermann during work to try and maintain his employment. Dr. Lodico testified that he could hear decompensation in Eckermann's cognitive functioning at these times.

Next, the Vocational Expert (VE), George Paprocki, testified. When questioned about what types of work the Claimant would be able to perform, the VE testified that he could perform work as a commercial cleaner, housekeeping cleaner, grounds keeper. (AR 768-69). When asked about whether an individual

9

who is off task 10 percent or more a day could maintain employment, the VE did not believe that that person would be employed very long. (AR 771).

## III

In her written Decision, the ALJ applied the standard five-step sequential evaluation process. The ALJ determined that Eckermann satisfied step one because he had not engaged in substantial gainful activity since April 1, 2004, the alleged onset date. (AR 656).

At step two, the ALJ found that Eckermann had the following severe impairments: schizophrenia and generalized anxiety disorder. (AR 657). The ALJ did not provide an explanation for which testimony she relied upon, although it appears that at step three she relied upon the medical evidence on record, as well as the Claimant's activities of daily living and ability to interact with others.

At step three, the ALJ found that the medical evidence did not establish that Eckermann's impairments met or medically equals the severity of a listed impairment, either individually or in combination. (AR 657). Specifically, the ALJ found that the Claimant did not meet the criteria of Listing 12.03 and 12.06. In activities of daily living, the ALJ found that Eckermann has mild restrictions. (AR 664). In social functioning, Eckermann was found to have moderate difficulties. (AR 664). With regard to concentration, persistence, or pace, Eckermann was found to have moderate difficulties overall, while completing more complex tasks or completing tasks under stress produced greater difficulty in this area of functioning. (AR 665). The ALJ determined that there were no episodes of decompensation, each of extended duration, as the two hospitalizations on record were not repeated episodes. (AR 665).

In her RFC determination, the ALJ determined the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is limited to simple, routine, and repetitive tasks with little if any independent decision-making and little if any change in work process from day to day; he is unable to perform fast paced hourly production demands; he is unable to work near hazard[]s such as dangerous machinery and unprotected heights; he is unable to engage in work interaction with the general public; he is limited to only occasional, brief, and superficial work interaction with coworkers and supervisors but the nature of the work is such that it should be done independently; and, he requires additional supervision of one or two minutes each hour to ensure on task and meeting competitive standards.

(AR 665-66). In formulating that RFC, the ALJ discussed some of the evidence of record regarding Eckermann's activities of daily living and focusing some of the discussion on his academic successes in college. (AR 667-68). Overall, the ALJ found that Eckermann's symptoms are regulated by medication and the limitations within the ALJ's RFC adequately address precipitating and aggravating factors or the Claimant's alleged disabling symptoms. (AR 669). The ALJ specifically disagreed that Eckermann needs "the 'constant reassurance' and handholding that his psychologist believes he requires." (AR 668). The ALJ specifically pointed to the record where the Claimant's parents were present at his counseling sessions, and determined that their presence was "clearly not necessary" because Eckermann was able to function in public and when he was away at college. (AR 668). Also, Eckermann was able to communicate without problems when his mother was not accompanying him to the sessions. Further, the ALJ found that Eckermann's low GAF scores were not afforded controlling weight and were not of great significant probative value; the Claimant's intact functioning, activities, and the objective medical record did not support a conclusion that the GAF scores affected Eckermann's ability to work. The ALJ

11

noted the contradictions between Eckermann's extracurricular activities and Dr. Lodico's assessment. (AR 672).

At step four, the ALJ determined that Eckermann has no past relevant work. (AR 675). At step five, the ALJ determined that Eckermann could perform a significant number of jobs that existed in the national economy. *Id.*

## IV

Eckermann argues that the ALJ erred in the following ways: 1) the ALJ failed to comply with a remand order; 2) the ALJ failed to properly assess the medical evidence; 3) the ALJ erred by failing to consider the proper factors when assessing the plaintiff's credibility and RFC; and 4) the ALJ erred in applying the incorrect legal standard for disability.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and

attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. See 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;
2) suffers from an impairment that is severe or whether a combination of her impairments is severe;
3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other

type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, the Claimant alleges error at steps three and four.

## V

First, Eckermann argues that the ALJ did not comply with the orders on remand when she failed to consider evidence that meets the criteria of Listing 12.06 (anxiety-related disorders). Specifically, he argues that the ALJ did not consider his several episodes of decompensation in the record under paragraph B nor did the ALJ consider his inability to independently function without extensive support from his parents under paragraph C.

The Commissioner responds that the ALJ considered the paragraph B and C criteria under the listing, and the evidence cited by Eckermann in his argument does not show that he met the criteria for the listing. Finally, the Commissioner adds that the ALJ discounted the opinions of Dr. Lodico and Dr. Nissen, so the evidence from those sources cannot support a finding under the listing.

According to the Social Security Administration, if a claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing in 20 C.F.R. Pt. 404, Subpt. P., App'x 1, the claimant is disabled. For listing 12.06 (anxiety-related disorders), paragraphs A and B or A and C must be met. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 12.06. The Listing provides the following:

> 12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;
or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id*.

15

The Court finds that the ALJ failed to comply with the Court's instructions on remand. Eckermann's treating physicians in the record are Dr. Lodico and Dr. Nissen. In the Court's Order dated August 19, 2014, the Court directed the following:

> Listing 12.06 addresses anxiety disorders, and requires that a claimant's impairment meets the criteria in paragraph A and either paragraphs B or C. 20 C.F.R. §§ 404, Subpart P, Appendix 1. In determining that Eckermann's anxiety did not meet or equal Listing 12.06, the ALJ discusses in some detail why Eckermann's symptoms do not qualify under Paragraph B. *See* R. 21, 24-25. However, her discussion of Eckermann's qualification under Paragraph C is limited to: "The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." R. 21.
>
> This conclusory statement fails to examine evidence relevant to paragraph C and to build a logical bridge from that evidence to the ALJ's decision. *See Giles*, 483 F.3d at 48788. Omitting such analysis prevents the Court from meaningfully determining whether this finding is supported by substantial evidence. *See Scott*, 297 F.3d at 595. On remand, therefore, the ALJ must sufficiently analyze evidence pertaining to the relevant listings so that the Court may meaningully review her conclusions regarding Eckermann's disability status.

(AR 821-22).

In her Decision, the ALJ offered the following analysis:

The undersigned has also considered whether the "paragraph C" criteria are satisfied. As noted by Dr. Strahl, the claimant does not have a residual disease process that has resulted in such marginal adjustment tht even a minimal increase in mental demands or change in environment would be predicted to cause an individual to decompensate; the claimant is not that fragile an individual. He does not have a history of one or more years of the indability to function outside of a highly supportive living arrangement; he has demonstarted the ablity to live independently while in college. The claimant now chooses to live with his parents, who provide him with free room and board. The claimant does not exhibit the

inability to function completely and independtly outside the area of his residence. In this case, the evidence fails to estabslih the presence of the "paragraph C" cirteria, as set forth in sections 12.03 and 12.06 of the listing of imapirments.

(AR 665).

This is an inadequate analysis of the paragraph C criteria. The evidence clearly indicates that Eckermann had issues living on his own in college, begging his parents to move back home. (AR 525). The ALJ discussed a Florida college tennis trip, where she claimed there was no evidence that he was "unable to relate appropriately to f[e]llow tennis team members or his coaches." (AR 662). However, his mother stated that he had several issues arise out of this trip (AR 329), although this opinion was dismissed by the ALJ because Eckermann's mother was a sympathetic family member (AR 673). Currently, Eckermann resides at his parents' house, where at night he lays down in his parents' bed for 30 minutes to an hour to get sleepy, because he experiences racing thoughts when he lies down alone in his room. (AR 272, 297). This evidence is directly pertinent to the paragraph C criteria, but it is not addressed by the ALJ.

While Eckermann demonstrated the ability to live independently while in college, this was not done without the aid and support of his treating physicians and parents, who throughout the record discuss his difficulties adjusting. Further, Eckermann has lived at home since graduation; there is no evidence on record that demonstrates he has the ability to live independently from his parents. There is also no evidence cited by the ALJ to support her conclusion that Eckermann can function independently outside the area of his home; in fact, there is no evidence she cites to support her conclusion that he functions independently inside his home. Indeed, the evidence supports the exact opposite. (AR 748-50). The ALJ's note that Eckermann lives at home for free implies he

does not want to work; however, Eckermann maintains that he has sent out numerous applications. (AR 191, 549, 994).[1]

While an ALJ need not provide a complete written evaluation of every piece of testimony and evidence, she does need to build a logical bridge from the evidence to her conclusion. See *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014), quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)(explaining that the ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence"). The Court finds that the ALJ did not cite evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). The ALJ inadequately supported her conclusion that Eckermann does not meet paragraph C, as no logical bridge could connect the contradictory evidence to her conclusion. This case should be remanded for further analysis under the 12.03 listing.

## VI

The ALJ also found that Eckermann did not meet Listing 12.06 under the paragraph B criteria. (AR 657). The Claimant objects to the ALJ's findings that there were no repeated episodes of decompensation. The Commissioner

---

[1]The ALJ's comment does not adequately address the criteria of paragraph C. Also, Eckermann's employment history records from the U.S. Army Tank Automotive and Armaments Command at Rock Island Arsenal specifically notes: "It is suspected that his file might have been 'tagged' as 'un-employable.'"(AR 191). According to that report, Eckermann had applied to 81 different positions. *Id*. While this evidence has no bearing on a finding of disability, the ALJ was certainly out of place in making this comment during her analysis under paragraph C, as it is an assumption not supported by the record and does not directly address his ability to function outside the area of his home.

responds that the episodes cited by Eckermann in his brief do not meet the requirements of the criteria.

The ALJ specifically singled out each of the four criteria in her explanation. (AR 664-65). In activities of daily living, the ALJ found that Eckermann only had mild restrictions because he performs at concerts, plays guitar in Sunday service, sometimes visits friends, and was highly functioning in college. The ALJ also stated that there is no indication that Eckermann is able to attend practices regularly, dresses appropriately, and maintains his appearance.

Regarding social functioning, the ALJ found that Eckermann has moderate difficulties, as he is able to play an instrument in an orchestra and at church and has a few friends. (AR 664). The ALJ also discussed a time in college where Eckermann successfully travelled to Florida with his varsity tennis team. He still plays tennis. The ALJ acknowledged that at times, Eckermann has difficulty interacting with his parents and the police were called on one occasion. (AR 665). Once Eckermann became paranoid at college and caused property damage at school. (AR 665, 393). The ALJ determined that Eckermann's ability to interact with friends, fellow orchestra members, church music group members, and his parents, coupled with his ability to walk around the mall and attend medical appointments, indicate that his social functioning is only moderately limited.

With regard to concentration, persistence or pace, the ALJ found moderate difficulties overall, although she found that he had greater difficulty when under stress or attempting more detailed job tasks. (AR 665). In her finding, the ALJ cited Eckermann's ability to use a computer and Facebook, play computer games, following directions when driving, and remembering instructions when performing music. The ALJ again referenced his ability to graduate *cum laude* from college in less than four years.

19

For episodes of decompensation, the ALJ noted that Eckermann only had two on the record, in 2005 and 2006, respectively. (AR 665). These episodes both required hospitalization. The ALJ determined that these were short in duration, and therefore were not "marked" or "repeated" as paragraph B requires.

In his brief, Eckermann cites several exhibits in the record to support his argument that the ALJ failed to consider evidence, although he does not indicate why they are relevant.[2]  The ALJ was not required to discuss every single exhibit, letter, or comment from Eckermann's medical evidence in the record. See *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2003) ("an ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence") (internal citations and quotations omitted).

On the other hand, the Court acknowledges that there are three other criteria in paragraph B besides the episodes of decompensation. Although Eckermann does not specifically argue that the ALJ erred in making her paragraph B findings outside the errors in finding no episodes of decompensation, the Court finds that the ALJ failed to properly consider the evidence as it pertains to the other criteria within paragraph B.

Eckermann cites information in the record that seems to contradict the ALJ. For instance, he cites a Function Report completed in 2010 where he describes his tumultuous relationship with his parents, his need to be reminded to wear clean clothes and get haircuts, and his problems with hygiene due to his

---

[2] For example, there is a report from a 2004 procedure to test whether or not Eckermann's spinal fluids indicated encephalopathy, a neurological disorder. (AR 248). Eckermann also includes records from a psychiatrist, Dr. James A.M. Sales, M.D., from the years 2004-2006. (AR 362-387). Further, there is another report from a neurologist. (AR 469). The Court cannot determine whether this evidence pertains to Paragraph C of the Listing 12.06, and, without a clearer argument from Eckermann, the Court is therefore unable to address it.

aversion to feeling wet. (AR 272-73). While driving, he gets nervous when he gets lost, even when his parents draw him maps. (AR 273). He has trouble concentrating when watching television and has problems making friends and maintaining friendships. *Id*. The ALJ seemed to gloss over his issues in the area of social functioning. (AR 273-74).

Even though one of his supervisors, who noticed Eckermann had problems understanding spoken instructions and job details, limited him to working the two slowest evenings of the week with the least public contact and least amount of detail work, he still lost his employment position. (AR 274). His parents have to leave him a to-do list because he cannot maintain his own schedule. *Id*. In 2007, he experienced various side effects from his medication and had issues adjusting to living on his own in his college dorm. (AR 515-23). In a 2010 evaluation by Dr. Nissen, Eckermann is reported as struggling with obtaining and maintaining a job. (AR 549). Additionally, Dr. Nissen noted: "I suspect under any kind of stressful situation with being under the scrutiny of other people, his paranoia is probably going to markedly exacerbate or his anxiety is going to worsen." (AR 549, 623).

Although the ALJ was not required to discuss every piece of evidence, she "must address significant evidence and explain why strong evidence favorable to the claimant is overcome by the other evidence." *Buckhanon ex. rel. J.H. .v Astrue*, 368 F. App'x 674 (7th Cir. 2010)(citations omitted). Here, there is evidence favorable to Eckermann that was left unaddressed and at times, misconstrued by the ALJ. Further, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the work force." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Eckermann's ability to play instruments he has long since mastered, even performing occasionally in public, do not equate to the amount of stress he would encounter in his employment. Similarly,

given the amount of instructions and reminders he needs from his parents in order to carry out daily activities, it is difficult to make the connection between his daily activities and ability to maintain employment.

Due to the Court's determination above, the ALJ should reconsider the evidence at step three as it pertains to both paragraphs B and C. If relevant, the ALJ should explain why she is discounting certain evidence, especially contradictory evidence. The ALJ cannot ignore or misconstrue evidence. See *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

## VII

Eckermann next argues that the ALJ failed to properly assess the medical opinions of Dr. Lodico, Dr. Nissen, Dr. Strahl, and Meryl Welsh. The ALJ, according to Eckermann, did not afford the proper weight to these opinions, and argues that her determination that they had "limited probative value" is not a correct standard. In particular, Eckermann argues that the ALJ should have given controlling or significant weight to Dr. Lodico. With respect to Dr. Strahl, Eckermann argues that the ALJ never explained how much weight was afforded to his opinion or why it was entitled to more weight than the two treating physicians. Moreover, Dr. Strahl even testified that Dr. Lodico was in a better position to make determinations about Eckermann's limitations. (AR 746).

The Commissioner contends that the ALJ properly explained the weight that she gave to each opinion, and Dr. Strahl's opinion was supported by substantial evidence.

While an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. §416.927(c)(3). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), citing *Moore v. Barnhart,* 278 F.3d 920, 924 (9th Cir.2002). See also, *Thomas v. Astrue*, 769 F. Supp. 2d 1113, 1125 (N.D. Ill. 2011).

When assigning weight (or little or no weight for that matter) to medical opinions, the ALJ must "minimally articulate" her reasons for doing so. See *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008). The ALJ is required to weigh conflicting evidence from medical experts. See *Books v. Chater,* 91 F.3d 972, 979 (7th Cir. 1996) (pointing out that when assessing conflicting medical evidence, an ALJ must decide, based on several considerations, which doctor to believe). The Court may not re-weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

The Court finds that the ALJ erred in her treatment of Dr. Lodico's opinion. In her Decision, the ALJ invited Dr. Strahl, as an independent medical expert, to testify in order to resolve conflicts in the medical evidence of record. (AR 659).[3]  The ALJ adopted Dr. Strahl's opinion that "the claimant does not require constant reassurance as assessed by Dr. Lodico." (AR 669). The ALJ discussed at length Dr. Lodico's opinion that Eckermann is unable to work 40 hours a week and needs constant reassurance in order to perform full time work. (AR 667-69). Ultimately, the ALJ favored Dr. Strahl's opinion that Eckermann's

---

[3] Eckermann's attorney objected to Dr. Strahl's testimony, but the objection was overruled. (AR 659).

functioning in multiple settings demonstrates that he does not need constant reassurance. (AR 669). It is also clear that the ALJ relied upon Dr. Strahl at step three. The ALJ explained that Eckermann's activities in college and his current activities require time and energy, and there is no indication that he needs constant reassurance, despite the evidence that his family and doctors offered that he does.

In rejecting the treating physician's opinion, the ALJ was required to consider the following: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). It is not clear from the ALJ's Decision that she considered these factors when discounting parts of Dr. Lodico's opinion.

In rejecting part of Dr. Lodico's opinion, the ALJ found Dr. Strahl directly contradicted Dr. Lodico's opinion that Eckermann needs constant reassurance at work. (AR 672-73). This is not sufficient to discount Dr. Lodico. A treating physician is entitled to controlling weight if supported by substantial evidence in the record. *Thomas*, 769 F. Supp. 2d at 1124. See also *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (where the ALJ erred by rejecting the treating physician and adopting the opinion of the non-examining consultant when he was instead "required to explicitly consider the details of the treatment relationship and explain the weight he was giving the opinion."). Also, a treating physician's opinion may not be dismissed because a non-examining physician has a contrary opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)

The ALJ found that Dr. Lodico's opinions were contradicted by Eckermann's descriptions of his activities. (AR 673). These explanations are not sufficient for rejecting a treating physician's opinion. The ALJ appeared to play

doctor; she determined that Eckermann's activities in college and now add up to at least 40 hours per week. (AR 673). According to the ALJ's Decision, orchestra, tennis, and academic success are "work-like activities," and Eckermann does not require constant reassurance from his coach or conductors. (AR 673).

There is no substantial evidence that is inconsistent with Dr. Lodico's opinions, apart from the testimony of Dr. Strahl. However, even Dr. Strahl testified that Eckermann's inability to handle stress when he is around other people exacerbates his symptoms (AR 717, 719). Dr. Strahl testified that any position where Eckermann would have to socially interact would take his limitation to the marked or extreme level. (AR 710-21). According to Strahl, there should be about five people or less within proximity of Eckermann while he is working. (AR 735). In fact, he stated that working with others will worsen Eckermann's stress and schizophrenia, and he would no longer be able to continue working. (AR 733). He also testified that Eckermann is moderately limited in his ability to sustain an ordinary routine without special supervision. (AR 721). Importantly, the VE also testified that an individual who is off task 10 percent or more a day could not maintain employment. (AR 771). Eckermann's work history, discussed *infra,* strongly suggests that he would indeed be off task for at least 10 percent of the work day.

The ALJ created a gap in the record by discounting the Claimant's 10-year treating physician. By favoring the consultative physician, who more than once during the hearing deferred to Dr. Lodico, over the treating physician, the ALJ committed reversible error. Dr. Lodico's opinions were not inconsistent with other substantial evidence – even the testimony of Dr. Strahl – and the ALJ appeared to be playing doctor. Upon remand, the ALJ shall revisit the factors required by 20 C.F.R. § 404.1527 and 20 C.F.R. § 416.927 in her analysis of Dr. Lodico's opinion.

## VIII

Eckermann also objects to the treatment of the other medical opinions on record, as well as Eckermann's credibility. Given the ALJ's error in her treatment of Dr. Lodico's and Dr. Stahl's opinions, on remand, the ALJ should reweigh all the medical opinions in the record and Eckermann's credibility after properly analyzing the medical opinions of Dr. Lodico and Dr. Stahl. *See e.g. Davis v. Commissioner of Social Security*, 2016 WL 2885866, *9 (C.D. Ill.) (requiring ALJ to revisit the plaintiff's credibility on remand after finding ALJ erred as to other matters which would naturally affect the ALJ's assessment of the plaintiff's credibility).

## IX

In conclusion, the Court recommends that the Plaintiff's Motion for Summary Judgment be granted and Commissioner's Motion for Summary Affirmance be denied. Upon remand, the ALJ should reevaluate the 12.06 paragraph B and C criteria and specifically address the evidence that pertains to these criteria.  Additionally, the ALJ should reweigh all the medical opinion evidence in light of her findings, as well as Eckermann's credibility.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation.  FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on December 12, 2016.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE